UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14074-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA

vs.

SHANNIMA YUANTRELL SESSION,
    a.k.a. "Shalamar"
    a.k.a. "Lean"
    a.k.a. "Dreds"
    a.k.a. "Rasta"

    **Defendant.**
_____/

## UNITED STATES' FACTUAL PROFFER AND MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits its factual proffer and memorandum of law in support of its motion to detain Shannima Yuantrell SESSION ("Defendant") pending trial. On December 8, 2022, Defendant was charged in a 10-count indictment with 7 counts of sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a)(1) and (b)(1), 2 counts of sex trafficking of a minor and by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1), (b)(2), and (c), and 1 count of sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a)(1), (b)(2), and (c) (DE 3).

### Facts

Defendant's pretrial detention hearing is currently set for June 20, 2023. Based on the below facts, as well as Defendant's extensive criminal history, Defendant is a danger to the community and a serious risk to not appear for judicial proceedings. There are no conditions or

combination of conditions that will reasonably assure Defendant's appearance in court or the safety of the community. Pursuant to 18 U.S.C. § 3142, the United States is seeking pretrial detention and proffers the following information in support of the upcoming detention hearing:

Between approximately 2011 and 2019, Defendant trafficked several juvenile and adult females in the Highlands County areas of Sebring, Avon Park, Lake Placid, and elsewhere. Defendant recruited his victims through offers of drugs, employment, romantic relationships, or through brute force. Defendant then trafficked his victims for sex, primarily in rural parts of Highlands County. Defendant used violence, threats, drugs, and other tactics to coerce and control his victims. Over the course of the trafficking, Defendant used cell phones, vehicles, rental properties, condoms, retail products, controlled substances, and other items that were in and affecting interstate commerce.

## Count 1

Defendant met Victim 1 at a club in Sebring in approximately 2011. At the time, Victim 1 was working at a hospital, and the two began a romantic relationship, which went well for a few months. The relationship eventually became physically abusive, with Defendant beating and threatening Victim 1. Defendant set rules and demanded compliance from Victim 1.

Eventually, Defendant told Victim 1 that he wanted her to have sex with an unknown male for money; and when Victim 1 refused, Defendant beat her until she complied. For this first commercial sex act, a man paid Defendant to have sex with Victim 1 in the back of Defendant's car, while Defendant was present.

Defendant then began taking Victim 1 to rural areas in Highlands and Okeechobee Counties, taking money from men in exchange for sex with Victim 1. Defendant also used other women and girls to make money in this same manner, and he would assign them "stage names."

On a normal occasion, Defendant drove Victim 1 and the other victims to one of the frequented areas, and he had the victims stand outside the car while the buyer picked the woman he wanted. Defendant collected the money, which was usually around $25 for 10 minutes, but the price could vary. Defendant dictated what sexual acts were permissible.

Defendant used violence and threats to gain Victim 1's compliance, including pressing a firearm to Victim 1's head and threatening to kill and mutilate her.

Victim 1 witnessed Defendant trafficking other victims. For example, Victim 1 witnessed Victim 2 engaging in commercial sex for Defendant's financial benefit. Victim 1 also witnessed Defendant having sex with Victim 2, who was a minor at the time. Victim 1 remembers seeing Victim 2 with bruises and smeared blood. Victim 1 also witnessed Defendant beating Victim 3 badly, and heard Defendant say that he had to "straighten" Victim 3 out.

On March 3, 2012, the Lake Placid (Florida) Police Department responded to a trailer residence in Lake Placid, Highlands County. On scene, the officer found 15-year-old Victim 2 in the back seat of a vehicle. Victim 1 was inside the residence, while Defendant sat outside. Defendant claimed that he was there visiting a good friend, but he could not provide the real name of the "friend" inside the residence. Defendant denied knowing what Victims 1 or 2 were doing there. Victim 2 was the only person arrested.

## Count 2

Victim 2 met Defendant in around 2011 while walking down the street in Highlands County, Florida; Defendant was selling perfume and asked her to help him sell his merchandise. Victim 2 told Defendant she was 16 years old, when she was actually younger. The two then began a sexual relationship.

3

Victim 2 did whatever Defendant wanted because he was violent, and he had slapped Victim 2 and pulled her hair on multiple occasions. Victim 2 also witnessed Defendant be physically abusive of Victim 1. About one month into their relationship, Defendant asked Victim 2 to make money by having sex with other men. Defendant would charge $50-$100 for men to have sex with Victim 2, and he would split the money with Victim 2.

Defendant called and text messaged Victim 2 to keep in touch with her and say when he needed her, including on the day they were encountered by the Lake Placid Police Department. Victim 2's relationship with Defendant ended on the date of her arrest.

### Count 3

Defendant met Victim 3 around 2012 and introduced her to commercial sex. Defendant would take Victim 3 and other female victims to particular areas where he would advertise them for commercial sex for his financial benefit. Defendant would have the women get out of the car, and the buyers would select one of Defendant's victims, and then the buyers would pay Defendant. Victim 3 stated that whatever money she made for Defendant, Defendant kept. Defendant normally charged $25, but he would charge $50 for Victim 3. Defendant dictated what sexual positions were permitted, and Defendant assigned the victims fake names.

Defendant made Victim 3 and the other victims work, even if they did not want to. He was also violent with Victim 3, in one instance beating her so badly that she could not go to her parents' house for 2 weeks. Victim 3 stated that Defendant treated Victim 1 the worst, and she saw him physically abuse Victim 1. Victim 1 was at times forced to look at the ground, and Defendant hit her for looking around.

Defendant provided condoms to his victims to use during the commercial sex acts.

4

Count 4

In approximately 2012, Victim 4 met Defendant when she was 15 years old in Avon Park, Florida.  Victim 4 needed a ride one day, and another man introduced her to Defendant.  Instead of driving Victim 4 to a relative's house, as she had planned, Defendant took Victim 4 to another man's apartment.  Once inside, he pushed Victim 4 into a bedroom and raped her while she screamed for help.  Afterwards, Victim 4 wanted to leave, but Defendant beat her.

Defendant then took Victim 4 back to his residence in Lake Placid and gave her cocaine, saying that this was the life that she could have.  Victim 4 eventually became addicted to the cocaine that Defendant provided to her.

Defendant later took Victim 4 to a single-story apartment complex in Sebring, which she identified to investigators.  Defendant was armed with a firearm and gave Victim 4 instructions about interacting with the men inside.  He then handed Victim 4 a condom and told her to go get the "business done."  Each of the men inside the apartment complex paid approximately $60 for commercial sex acts with Victim 4, and Victim 4 estimated that she had commercial sex with 15 men on that first day.

This conduct went on for several months, during which Defendant provided Victim 4 with cocaine, and physically and sexually abused her.  Defendant kept all the proceeds that Victim 4 earned from commercial sex acts.

Count 5

Victim 5 met Defendant in 2016 when he contacted her through social media.  The two began a romantic relationship that was marked with significant violence and frequent police visits. Around 6 months into their relationship, Defendant first brought up the idea of Victim 5 having

sex with men for money. Defendant told Victim 5 that she could use a condom, that he could get a "few girls," and they could make thousands of dollars per night. Victim 5 refused.

A few months later, Defendant brought home suggestive clothing and showed Victim 5 items like condoms, baby wipes, and lubrication. Defendant again talked to Victim 5 about "working," and Victim 5 again refused. Victim 5 then went to take a shower, but Defendant followed her and repeatedly struck her in the back of the head.

Over the course of their relationship, Defendant physically and sexually abused Victim 5, and he occasionally confined her to a room or his house. During one incident when Defendant was abusing Victim 5, law enforcement responded. Victim 5 initially declined to provide a statement. Victim 5 later changed her mind and called the deputies, who photographed bruises on Victim 5's arms and legs.

Investigators interviewed an employee of the restaurant where Victim 5 worked. The employee remembered Defendant and stated that he would stalk Victim 5 while she was at work, which occasionally made Victim 5 anxious and frantic. Defendant would drive around the parking lot playing loud music or would come inside the restaurant and just stand and watch Victim 5.

Victim 5 never gave into Defendant's demands that she engage in commercial sex, saying that she would rather be beaten than let 10 men have sex with her.

### Count 6

Around August of 2018, Victim 6 met Defendant through an acquaintance. Victim 6 was looking for a place to stay and moved in with Defendant. Soon thereafter, Defendant told Victim 6 that an acquaintance would pay money to have sex with Victim 6; but Victim 6 said no. Later,

Defendant asked Victim 6 why she refused, tackled her, and then hit her repeatedly in the back of the head.

Several days later, Defendant told Victim 6 to get dressed and drove her to a rural area in Highlands County.  When they arrived, a man approached and asked Defendant "how much?" to which Defendant replied, "50."  Defendant then told Victim 6 to go inside the residence and do whatever the man wanted, but if he wasn't done in 15 minutes, she should get dressed and walk out.  Not wanting to get hit again, Victim 6 complied.  Defendant then took her to a second residence, where the same thing happened.

The following weekend, Defendant took Victim 6 out again, and Victim 6 had commercial sex with approximately 9 men.  Defendant gave Victim 6 $50, which was the last time he gave her any of her earnings.  These incidents occurred a few times a week over a few months.

Agents searched Defendant's phone pursuant to a federal search warrant (20-074-SMM). In his phone, agents found messages from Defendant to Victim 6, in which Defendant provides explicit instructions on a sexual activity to perform on another male.  The messages also contain what appear to be updates from Victim 6 during a commercial sex transaction.

On October 20, 2020, agents executed a federal search warrant on Defendant's residence in Lake Placid, Florida (20-065-SMM), and then executed another federal search warrant for a device found in that home (21-015-SMM).  In that phone, agents found text messages from the phone's user, calling himself "Rasta," and another man named R.J.  In that conversation, "Rasta" sent 4 nude photographs of Victim 6, telling R.J. to "stop by tonight."  Agents interviewed R.J., who confirmed paying for sex with women at Defendant's home.  In fact, R.J. described Defendant's house as "the best little whorehouse in Lake Placid."

On November 3, 2018, Victim 6's father called the Highlands County Sheriff's Office to request a welfare check for Victim 6. Victim 6 was staying with Defendant and had recently told her mother that she was scared and wanted to leave. Deputies found Victim 6, who was initially uncooperative and denied that Defendant hurt her due to her fear of Defendant. Later, however, Victim 6 disclosed Defendant's actions and abusive conduct toward her.

Count 7

Victim 7 met Defendant in 2018 and moved into his home almost immediately. While Victim 7 was living in Defendant's home, Defendant usually had "random" women with him, as many as six at a time, but Defendant always wanted to "make the rules" and did not want the women knowing each other's names. Defendant made comments about Victim 7 having to contribute to the house and pay her share. He also had a gun, and he let the women know about it. Victim 7 described feeling trapped.

About a month into living with him, Defendant began to have Victim 7 have sex with men for money. Defendant also had multiple other women doing the same thing. Defendant would take Victim 7 and the others to rural areas in Highlands County, where he would have them wear underwear and high heels and walk around in front of residences. The men paid Defendant directly, typically $50-$100 for each commercial sex act.

Defendant used emotional and physical abuse to control Victim 7. Defendant would frequently not let Victim 7 see her friends. He would also give Victim 7 drugs, and then demean her and call her an "addict." Defendant would hold Victim 7 against the wall by her upper chest and/or throat area, and Victim 7 recalled feeling "like a small dog" around Defendant. Defendant would also take away Victim 7's phone or "food privileges."

Count 8

In November of 2018, Victim 8 was struggling with drug addiction and family issues. An acquaintance told her that she knew an "entrepreneur" (Defendant) who could pay Victim 8 for helping him market his small businesses. Later that month, Defendant picked Victim 8 up in his Mercedes, and he began telling Victim 8 about how they could "build an empire" and get Victim 8 out of her current situation. Defendant took Victim 8 back to his residence in Lake Placid, where later that night, they had sex. Victim 8 described the sex as "consensual," but stated she only did it because he had a firearm next to him.

The next morning, Defendant woke Victim 8 up and drove her to an area in Lake Placid. When they arrived, Victim 8 resisted getting out of the vehicle, but Defendant lifted his shirt and revealed a firearm. While at this first location, Victim 8 began to cry, so Defendant told her to get back in the car.

Defendant then took Victim 8 to a dollar store, where he bought her nail polish and mascara and told her to clean up her appearance. Defendant had his gun in plain view at the time. Defendant then drove her to another rural area in Highlands County, told her to lose her attitude and clean her face, and then asked, "do you know what time it is?" Defendant told Victim 8 that sacrifices had to be made, and to get out of the car and look submissive.

Defendant gave Victim 8 rules about the commercial sex transactions, and said that the customers paid for 10 minutes, and not to stop until she made $500. Victim 8 went into 3 residences, where she estimates she had sex with around 6-8 men in each residence.

Afterwards, Victim 8 was crying and told Defendant that she could not do that again, and that her "soul died today." Defendant then called the acquaintance that introduced them, complaining that Victim 8 was being non-submissive, uncooperative, and was talking back.

When they got back, Victim 8 called her grandmother and boyfriend, who then came and picked her up.

Agents interviewed Victim 8's grandmother. The grandmother remembered receiving a call from Victim 8 and driving to pick Victim 8 up. When she arrived with Victim 8's boyfriend, Victim 8 jumped in the car and said "we're not safe; let's go."

In Defendant's cell phone, agents found a video that Defendant took of Victim 8 in his house. In the video, Victim 8 is sitting on the floor, visibly upset. Defendant says to Victim 8 that he was "kind enough" to invite her into his house, and Victim 8 says "I'm just an object to make you money." Defendant then says he's hungry, and Victim 8 retorts "go eat; you got extra money now."

## Count 9

In 2018, when Victim 9 was around 16 years old, she was driving through Avon Park, Florida, with her mother. Defendant drove by in a silver Mercedes, and Victim 9's mother seemed to recognize him. They all pulled over and began socializing. The mother later said she had to run some errands, but she left Victim 9 with Defendant, hoping that Victim 9 could work for Defendant at one of his businesses.

Defendant took Victim 9 back to his house, where he told Victim 9 to pick out some clothes for herself and her mother. Defendant then told Victim 9 to take a shower, and Victim 9 complied.

When Victim 9 got out of the shower, Defendant took her to his couch and had her lay on her back. Defendant then began manipulating her vaginal area and performing oral sex on her, saying "we're gonna make a lot of money off of this." Victim 9 explained that she did not handle pressure well, and just went along with what Defendant wanted. Defendant and Victim 9 then had sex.

Later in the day, while others were at Defendant's house as well, Defendant gave Victim 9 a beer. According to Victim 9, things then got "blurry," and Victim 9 woke up in Defendant's bedroom. Victim 9 was unable to leave the room, as the door had been nailed shut. Victim 9 then panicked and began to bang on the door. When Defendant eventually got the door open, he appeared nervous, saying that Victim 9's mother had been "blowing up" his phone. Defendant then took Victim 9 home, and Victim 9's mother called the police to report what happened.

Agents recovered messages in Defendant's phone from Victim 9's mother. In those messages, the mother says "Shalamar…wheres [Victim 9]." Victim 9's mother sent many more messages demanding to know where her daughter was, eventually saying "u aint pimpin this one…she aint dumb but shes young."

### Count 10

Victim 10 was in an abusive relationship that led to drug addiction and unemployment, and then she was introduced to Defendant in the fall of 2018. When Defendant first met Victim 10, he brought drugs to her and asked if she wanted to party. He then drove Victim 10 to his house in his Mercedes, along with another woman. Defendant was immediately controlling of Victim 10, and a few weeks later, she moved into his residence and stayed there for about a month. There were other women living with Defendant and "working" for him, and he immediately began trying to convince her to do the same. Victim 10 stated that Defendant knew she was "vulnerable" because of her drug addiction and unemployment.

One night, the other women in the house were, for some reason, unavailable, so Defendant told Victim 10 that she had to come with him. Defendant took Victim 10 to a dollar store, where he bought her short underwear for her to put on. He then took her to a rural part of Highlands County, to a residence where there were dozens of men and beer strewn about. Victim 10 became

overcome with fear and said she couldn't do it, and Defendant became angry and took her to another residence that was quieter. Victim 10 was still very reluctant, but Defendant lifted his shirt and showed her a gun, which Victim 10 interpreted as Defendant implying that he would protect her. Defendant then provided her with drugs to use, which she did. Defendant also gave her rules to follow during the sexual transactions.

Defendant then took Victim 10 inside the residence, in which there were 6 drunk men. One man paid Defendant $20 to grope Victim 10, while 2 others paid $40 to have sex with her. Victim 10 commented about how $40 was very low, to which Defendant replied that she was "no spring chicken," and that she should be glad he could get $40 for her. After the last man had sex with Victim 10 for Defendant's benefit, Defendant tried to get Victim 10 to go to other houses, but Victim 10 refused. Defendant got mad, took her home, and called another woman, whom he took back out. Victim 10 received none of the $100 she made.

For the rest of the time Victim 10 was with Defendant, she did not engage in commercial sex; however, Defendant continuously attempted to get her to participate. During that time, Defendant was controlling, including not letting Victim 10 leave or speak with neighbors. Defendant also made comments that if Victim 10 left, he would find her. During one argument, Defendant told an acquaintance that he was "about to kill this b***h." During other arguments, Defendant would occasionally take out his firearm, set it on the table, and walk away.

Additional Evidence

As previously stated, agents recovered and searched Defendant's cell phone. During that search, agents recovered messages indicative of sex trafficking. In one conversation, dated January 24, 2019, an unsaved number texted Defendant asking, "What's up/the rate with the girl for about 30 minutes?" If Defendant responded, the message was not preserved. On January 30,

2019, that same number asked, "Do you have any females with u?" Defendant responded that he had a surprise probation visit, and that he would "link up tomorrow."

During a November 9, 2018, text message conversation, Defendant received messages that included 4 images of a female who was scantily dressed and provocatively posed. Defendant replied "I told her that I am a business man, and I will bless her, but I am not going to allow her to Tax me. So if she wants to make something…I was going to give her a $100 and doll her up so we can make money tomorrow." Defendant later stated "See [sic] send me to voicemail…Meth head."

On May 19, 2020, an unsaved number texted Defendant "Yo this is [REDACTED] call me Asap ASAP." On May 24, 2020, this sender texted "I need a while girl" (presumably meaning "white" girl). Agents did not recover any preserved response from Defendant. On June 11, 2020, the texter gave Defendant an address, which is in Lake Placid, then said "When you get close call me I'll come outside." Defendant replied "I am close by."

On December 16, 2018, Defendant sent a message to an unidentified person saying "got a pretty lil home girl, that you can have a great dinner with, at my place tonight. You don't have to give her anything. And she will service you greatly. Keep that on the low. I am just trying to allow to have some fun." The person declined, and Defendant stated, "no problem just let me know when your stress level kicks in, because I have a lot of pretty home girl."

On December 4, 2018, Defendant messaged an unknown individual, saying "I need a real pretty hoe! Do you have any girls who are about making money…If so I will give you $100 for everyone you bring…I have a 4 bedroom pin house [sic] on the Lake here in Lake Placid." The recipient replied that he would try to find some and let him know.

Criminal History

As reflected in the pretrial services report, Defendant has an extensive criminal history, including the following:

| Year | Case No. | Jurisdiction | Offense(s) | Sentence |
|---|---|---|---|---|
| 1994 | 94CF000112 | Highlands Co. | Sale of Cocaine<br>**VOP** | 26 mos. DOC |
| 1994 | 94CF000522 | Highlands Co. | Poss. Marijuana w/Intent to Sell<br>Poss. Cocaine w/Intent to Sell | 26 mos. DOC |
| 1995 | 95CF000594 | Highlands Co. | Resisting Officer With Violence | 26 mos. DOC |
| 1995 | 95CF000605 | Highlands Co. | Grand Theft (Motor Vehicle) | 26 mos. DOC |
| 1998 | 98CF000118 | Highlands Co. | Poss. Cocaine | 22 mos. DOC |
| 2000 | 00-14053-CR | SDFL | Poss. Cocaine Base w/Intent to Distribute (+5g)<br>**VOSR** (x2) | 140 mos. BOP |
| 2013 | 13CF000638 | Highlands Co. | Poss. Cocaine w/Intent to Sell<br>Introducing Contraband to Detention Facility<br>**VOP** | 13 mos. DOC |
| 2020 | 20CF001206 | Highlands Co. | Sexual Battery<br>Kidnapping | Pending |
| 2021 | 21CF000032 | Highlands Co. | Violation of Condition of Pretrial Release<br>Domestic Battery<br>Witness Tampering | Pending |

## **Analysis**

Under 18 U.S.C. § 3142, a defendant may be detained pending trial if a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A judicial officer's finding of dangerousness must be "supported by clear and convincing evidence," 18 U.S.C. § 3142(f)(2), while detention based on risk of flight must be proven by a preponderance of the evidence.   United States v. King, 849 F.2d 485, 489 (11th Cir. 1988).

"In order to trigger section 3142(e)'s rebuttable presumption, the government need not make a showing of probable cause independent of the grand jury's indictment." United States v. King, 849 F.2d 485, 487–88 (11th Cir. 1988). See also United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010); United States v. Hurtado, 779 F.2d 1467, 1479 (11th Cir. 1985). The presumption in favor of detention "is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." Stone, 608 F.3d at 945.

Certain subsections of 18 U.S.C. § 3142 apply specifically to this case, and are as follows:

i. § 3142(e)(3)(D): As each count is an offense under Title 18, Chapter 77, with a maximum prison sentence of 20 years or more, there is a rebuttable presumption that no conditions will reasonably assure Defendant's appearance and the safety of the community.

ii. § 3142(e)(3)(E): As counts 2, 4 and 9 are offenses involving a minor under § 1591, there is a rebuttable presumption that no conditions will reasonably assure Defendant's appearance and the safety of the community.

iii. § 3142(e) and (f)(1): detention is authorized in the instant case because the indictment charges violations of § 1591 (subsection A), the charged offenses carry maximum sentences of life imprisonment (subsection B), Defendant's criminal history (subsection D), and 3 counts are felonies involving minor victims (subsection E).

iv. § 3142(e) and (f)(2): detention is authorized in the instant case due to the serious risk of flight or obstruction of justice.

Congress has outlined factors for courts to consider when making a detention decision, and the relevant and applicable factors, from 18 U.S.C. § 3142(g), are discussed below:

1) <u>The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, or involves a minor victim.</u>

As detailed in the above proffer, the nature and circumstances of Defendant's many charged offenses are heinous. Defendant's charged conduct, which spanned almost a decade, included horrific sexual and physical violence against adult women and minor girls. The evidence indicates that Defendant targeted females who, for a variety of reasons, were vulnerable to his influence and coercion. Once Defendant gained control over his victims, he used them for his own financial profit. His targeting of extremely vulnerable women was persistent, shameless, and ruthless. The harm that each of these women have suffered at the hands of this Defendant is immeasurable. This factor weighs heavily in favor of detention.

2) <u>The weight of the evidence against the person.</u>

The above proffer also demonstrates that the evidence against Defendant is overwhelming. 10 different women, most of whom did not overlap with each other, described similar suffering and exploitation at Defendant's hands. And this testimony is buttressed by the digital evidence recovered from Defendant's devices, which clearly show that Defendant was involved in sex trafficking.

3) <u>The history and characteristics of the person.</u>

Defendant has a lengthy and troubling criminal history, which includes a 140-month prison sentence for a federal drug trafficking conviction. Defendant has also violated probation and federal supervised release 4 times. Additionally, the entirety of the charged conduct, in the instant indictment, occurred while Defendant was on federal supervised release and/or State of Florida probation.

4) <u>The nature and seriousness of the danger to the community.</u>

Defendant's charged offenses demonstrate that he has no concern for the safety or wellbeing of others, and he will not hesitate to harm anyone, including vulnerable adults and minors, if it benefits him. Defendant actively sought out, targeted, and recruited extremely vulnerable victims in this case. Defendant has also demonstrated that Court orders and supervision mean nothing to him.

Defendant poses a grave danger to the community. Based on the proffered facts, as well as Defendant's extensive criminal history, Defendant is a danger to the community and a risk to not appear for judicial proceedings. There are no conditions or combination of conditions that will reasonably assure Defendant's appearance in court or the safety of the community. Therefore, pursuant to the statute sections cited above, the United States requests that Defendant be detained pending trial.

        Respectfully submitted,

        MARKENZY LAPOINTE
        UNITED STATES ATTORNEY

By: *s/ Justin L. Hoover*
    Justin L. Hoover
    Court ID A5502493
    Assistant United States Attorney
    Justin.Hoover@usdoj.gov
    United States Attorney's Office
    101 South US Highway 1, Suite 3100
    Fort Pierce, Florida 34950
    Telephone:  772-466-0899
    Facsimile:  772-466-1020

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

**/s/ Justin L. Hoover**
Justin L. Hoover
Assistant United States Attorney